OPINION OF THE COURT
James M. Kindler, J.
This case was sent to me for a combined Rodriguez, Huntley, Dunaway hearing. Defendant is charged by indictment with assault in the first degree and related charges, emanating from a fight at the Anna M. Kross Center (AMKC), a housing facility at the city detention center on Rikers Island. Both defendant and the alleged victim, James Albano, were, at the time of the charged assault, being detained at AMKC, pending trial, Albano on burglary charges and defendant on charges not specified at the hearing.
The witnesses at the hearing were William Sheridan, an investigator in the Intelligence Division of the New York City Department of Correction (DOC), and Captain Margarita Williams, Captain Robert Cruz and Captain William Sellers, also from DOC. I find the witnesses’ testimony credible and find the following facts based on that testimony:
On May 25, 2011, shortly after 2:00 p.m., Captain Robert Cruz arrived at the scene of an incident in cell 11, in housing area “18 lower,” of AMKC. The first supervisor to arrive there, he was informed by other officers that there had been a fight between the two cell mates in cell 11 and both were injured— there were only two inmates assigned to cell 11 at that time. Defendant was still in the cell, alone, and Captain Cruz ordered him to come out. The captain applied a cuff to one of defendant’s wrists but could not cuff the other wrist because defendant said his shoulder hurt when his other hand was put behind his back. Captain Cruz went to the day room where defendant’s cell mate, James Albano, had been taken, and saw that Albano was missing about a third of his left ear. Albano told the captain that his cell mate had chewed his ear off. Captain Cruz returned to cell 11, and, along with another captain, found a piece of the ear in the cell and kept it cold with ice to help preserve it. When the “probe team” arrived, Captain Cruz got a second pair of *273 handcuffs from them and, handcuffed defendant behind his back, using the two pairs of cuffs. Defendant was “upset” but cooperative and was taken by another team of officers (headed by Captain Sellers) to the “intake” area for questioning. According to Captain Cruz, inmates were “automatically” taken to intake when an incident like this occurred in the facility, unless they were seriously injured. Captain Cruz, whose assignment was to collect relevant information and investigate what happened in the cell, made no determination whether either of the inmates involved should be arrested.
None of the captains or other officers involved in the investigation or transporting defendant to intake told defendant where he was being taken or that he was being taken for questioning. Nor was he given a choice whether to go to intake. Captain Sellers, who was with defendant when he was escorted from the housing area to intake, testified that defendant was told only to “remain quiet and just keep walking,” until he got to the area where he would be secured. Captain Sellers estimated the intake area to be 200 to 250 yards* from the scene; it was accessible from the housing area through corridors in the building—a three-to-five-minute walk. The intake area itself was a busy area of the facility, which inmates passed through on their way to and from court, to the clinic or to trials within the facility. There were also individual cells in intake, in one of which defendant was secured. Once there, his handcuffs were removed.
Captain Margarita Williams, the “security captain,” testified she went directly to intake when notified of this incident. According to Captain Williams, it was standard procedure after a fight between inmates to separate them and take them to intake for questioning in order to determine what happened. Albano was taken to the clinic instead, because of his obvious injury. When Captain Williams got to intake, defendant was in a cell, by himself; he was not handcuffed. Captain Williams regarded her questioning of defendant as investigatory, an effort to find out “the details of the incident to see if anyone else in the housing area . . . was in danger or we had to separate anybody else in the area.” She said that she routinely told all defendants they didn’t have to answer questions if they didn’t want to.
*274 Investigator William Sheridan had been summoned to the medical clinic at AMKC, where he saw Albano lying on a stretcher, bleeding profusely from one ear. A piece of the ear was missing. Albano told Sheridan that he had been in an argument with his cell mate, that the cell mate jumped him and bit a piece of his ear off. He also told Sheridan he wanted to press charges. Albano did not know his cell mate’s name and did not say how long they had been staying together in the cell. Sheridan then went to cell 11 in housing area 18 lower where the incident occurred. There he saw blood on the floor. Defendant was not in the cell, having already been taken from there to the intake area. From other sources, including DOC records, Sheridan learned that both Albano and defendant were housed in cell 11 and both were part of the “house gang” at 18 lower, a detail assigned to keep the area clean.
Sheridan next proceeded to the intake area where he and Captain Williams briefly asked questions of defendant, who seemed “disoriented” and “agitated.” Defendant was not given his Miranda warnings before he was questioned. He answered the questions orally and his answers were reduced to writing by Captain Williams; the resulting document was signed by Sheridan, Williams and defendant. The written statement said, “We were house gang. He kept telling me what to do. Finally he hit me and I hit him back. I defended myself and I bit his ear.” Captain Williams arranged for defendant to see a doctor after the interview; she later learned he had a dislocated shoulder.
Defendant was arrested on June 17, 2011 and charged with assaulting Albano; Albano was not arrested. It is not clear from the testimony exactly who determined that defendant, and not Albano, should be arrested. Investigator Sheridan seemed to believe it was his decision, but that seems unlikely, judging from the testimony of the other witnesses. Captain Cruz believed the decision was made by someone in a position of higher authority at DOC.
On these facts, no issue is raised under People v Rodriguez (79 NY2d 445 [1992]) as to whether Albano was sufficiently familiar with defendant for the authorities to dispense with a lineup, in favor of a less formal identification procedure. Here, there was no identification procedure at all: the authorities never arranged for Albano to see defendant at the jail or elsewhere to see if he could identify defendant as the person who bit part of his ear off. Accordingly, there is no constitutional issue to address by way of a Rodriguez hearing. The People *275 intend to have Albano identify defendant at trial, but that, in and of itself, does not raise a constitutional issue. (People v Cabrera, 170 AD2d 386, 386-387 [1st Dept 1991].)
Defendant complains that he did not get adequate notice, under CPL 710.30 (1) (a), of the oral statements to be used against him, as he only received notice of the written statement. But it would have been obvious to anyone receiving notice of the written statement that it was almost certainly preceded by an oral interview of defendant. In any event, the oral and written statements were, in substance, the same and were made at roughly the same time and in the same place; therefore, the notice provided was adequate for both. (People v Kelly, 200 AD2d 440 [1st Dept 1994].)
Whether or not defendant’s statement to corrections authorities should be suppressed—as, concededly, defendant was never given the warnings required by Miranda v Arizona (384 US 436 [1966])—turns on whether defendant was in “custody,” for Miranda purposes, when he was questioned. The leading case on this issue is People v Alls (83 NY2d 94 [1993]). The Alls court, in the interests of allowing correctional authorities to maintain discipline and order in their facilities, declined to adopt a “per se rule that any questioning of an inmate in a correctional facility is custodial interrogation under Miranda v Arizona.” (Alls at 100.) The Court concluded that interposing the requirement of administering Miranda warnings even before “casual or spontaneous interchanges” between inmates and corrections officers would be too burdensome on officials. The Court also said that it could envisage confrontations between corrections officers and inmates that were “analogous to the relatively brief, generally public, or otherwise on-the-scene investigatory detentions” in non-prison settings that are not considered custodial for Miranda purposes. (Id.) The Court, however, contrasted those encounters with interrogations under circumstances that entail “added constraint that would lead a prison inmate reasonably to believe that there has been a restriction on [his] freedom over and above that of ordinary confinement in a correctional facility.” In the latter setting, Miranda warnings are required. (Alls at 100.) On the specific facts before it, the Alls court held that, where an inmate was taken to an “isolated” place for questioning, the defendant would be considered to be in custody for Miranda purposes, unless the People could show that the inmate was told he had a choice whether to follow the officer who took him to the isolated area for questioning. (Alls at 102-103.)
*276 Confronted with a fight between two cell mates in which both were injured, one seriously, correction officials had reasonable suspicion to detain the inmates and, pursuant to Alls, question them in a setting “analogous to [a] relatively brief, generally public . . . on-the-scene investigatory detention[ ]” in a non-prison setting, in order to determine what happened. What occurred with respect to defendant is similar, in some respects, to such a non-prison investigatory detention. (Cf. People v Hicks, 68 NY2d 234 [1986].) The questioning took place only a short time after officials responded to the scene of the fight: the various persons in authority at DOC responded to the incident quickly, a short time later defendant was cuffed and escorted to intake. The questioning was investigatory—at the time, the facts were far from clear to responding officials. The questioning was brief—only about two minutes according to Captain Williams (the written statement itself consisted of only a few short sentences). And the intake area, unlike the basement interrogation site in Alls, was a busy area, which served as a transit area for inmates moving in and out of the facility. There, however, the similarities end, and the differences, now noted, violate the strict limits established by Alls for “non-custodial” interrogation of inmates. Defendant was not questioned at the crime scene, but taken by correction officers, in handcuffs, to intake, an area that was a significant remove from the scene and the cell where he was housed (in this case, one and the same) and away from the more familiar surroundings of the area where he worked as part of the house gang. Defendant was not told where he was going or why he was being detained. Nor, importantly, was he given the option to decline to accompany officers to intake. (See Alls at 102.) Defendant was directed to “remain quiet and just keep walking,” and, once in intake, he was put in a cell by himself, there to be questioned by Investigator Sheridan and Captain Williams.
These circumstances, in toto, amounted to an “added constraint” that would lead an inmate reasonably to believe that there was “a restriction on [his] freedom over and above that of ordinary confinement” in jail. (Id. at 100; cf. People v Hope, 284 AD2d 560 [3d Dept 2001].) Defendant was therefore in custody when he was brought to intake, and Miranda warnings were required before he was questioned about the fight with his cell mate. Captain Williams’s telling defendant that he did not have to answer questions if he didn’t want to was not, by itself, sufficient to satisfy Miranda. Captain Williams wanted to speak to *277 defendant, in part, to see if there were any other security issues to be dealt with; there was, however, no urgent need to question defendant about a threat to public safety that might have overridden the requirement to administer Miranda warnings. (Cf. New York v Quarles, 467 US 649 [1984].) Since it is conceded that no Miranda warnings were given, defendant’s statement is suppressed.
Defendant’s motion to suppress identification testimony is therefore denied, and the motion to suppress the statements defendant made to correction officials on May 25, 2011 is granted.
This decision supersedes in all respects my decision of December 12, 2013.

 Captain Williams estimated the distance to be “over 100 yards”; the 200-to-250-yard figure came from Captain Sellers. The two estimates are not inconsistent, but I note, in any event, that I consider Captain Sellers’s to be more reliable, given that it was he who had the responsibility for escorting defendant (and presumably others in a similar position) to the intake area.