05-5885-pr
*Georgison v. Donelli*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

(Argued: May 15, 2009                                    Decided: December 7, 2009)

Docket No. 05-5885-pr

_____

STEVEN GEORGISON,

Petitioner-Appellant,

- v. -

JOHN J. DONELLI, BARE HILL CORRECTIONAL FACILITY,

Respondent-Appellee.

_____

Before:  MINER, WESLEY, Circuit Judges, and STANCEU, Judge.[*]

Appeal from a judgment entered June 9, 2005, in the United States District Court for the Southern District of New York (Chin, J.) denying petitioner-appellant's petition for a writ of habeas corpus challenging his New York State conviction for assault in the first degree on the ground that his rights under the Fifth Amendment of the United States Constitution were violated by the admission in evidence of incriminating statements made by the petitioner to police detectives who interviewed him while he was incarcerated on an unrelated conviction and without affording him the warnings prescribed by Miranda v. Arizona, 384 U.S. 436 (1966).

Affirmed.

SUSAN M. DAMPLO, The Legal Aid Society, Criminal Appeals Bureau, Ardsley, N.Y., for Petitioner-Appellant

STANLEY R. KAPLAN, Assistant District Attorney, Bronx County (Joseph N. Ferdenzi, Assistant District

_____

[*] The Honorable Timothy C. Stanceu, Judge of the United States Court of International Trade, sitting by designation.

Attorney, <u>on the brief</u>; Robert T. Johnson, District Attorney, Bronx County), Bronx, N.Y., <u>for Respondent-Appellee</u>

MINER, <u>Circuit Judge</u>:

Petitioner-appellant Steven Georgison ("Georgison") appeals from a June 9, 2005 judgment entered in the United States District Court for the Southern District of New York (Chin, <u>J.</u>) denying his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. <u>Georgison v. Donelli</u>, No. 04 Civ. 1444 (DC), 2005 WL 1384015, *10 (S.D.N.Y. June 9, 2005). Georgison was convicted after a jury trial conducted in the New York State Supreme Court, Bronx County (Bamberger, <u>J.</u>, suppression hearing; Silverman, <u>J.</u>, trial and sentencing) on one count of assault in the first degree, in violation of New York Penal Law § 120.10[4]. <u>Id.</u> at *3. Following unsuccessful appeals in state court, <u>People v. Georgison</u>, 750 N.Y.S.2d 18 (App. Div. 2002), <u>leave denied</u>, 99 N.Y.2d 614 (2003), and the denial of his habeas petition in the District Court, we granted a certificate of appealability. The certificate was granted to allow review of Georgison's claim that his Fifth Amendment rights were violated by the admission in evidence of an inculpatory statement given to police investigators without affording him the warnings prescribed by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). The statements were given during Georgison's incarceration at the Riverview Correctional Facility on an unrelated conviction. For the reasons that follow, we hold that the state court's application of clearly established federal law, as determined by the United States Supreme Court, was not objectively unreasonable in this case, and, accordingly, that the application for a writ of habeas corpus was properly denied.

**I.     BACKGROUND**

A.     *The Assault of Alexander Fernandez and Investigation of Georgison*

In June of 1993, Alexander Fernandez was employed as a truck driver for Chambers Paper Fibers ("Chambers"), a private sanitation company. One afternoon in the early part of that month, while Fernandez was picking up refuse, he saw Georgison standing no more than three feet away from him. Fernandez kept an eye on Georgison for about two minutes and resumed his duties without further incident. Georgison, 2005 WL 1384015, at *1.

Later that month, on the morning of June 22, 1993, Fernandez drove his truck to the premises of Charles Green Corporation ("Charles Green"), a company in the Bronx, New York, for which Chambers provided waste removal services. Id. While Fernandez loaded waste from containers into his truck, another private sanitation truck, with "Mongelli Carting Company" ("Mongelli Carting") written on the side of the vehicle, approached. Id. Mongelli Carting had been the previous vendor for Charles Green and had been involved in a dispute with Charles Green. Id. Fernandez saw Georgison sitting in the passenger's seat of the approaching truck. Id. Fernandez, who was about twenty to twenty-five feet away from the Mongelli Carting truck, observed Georgison for about twenty seconds as the driver of the truck drove the vehicle into the loading bay on the Charles Green premises. Once Georgison exited the vehicle, he engaged in a brief argument with Fernandez regarding a blockade that Mongelli purportedly was conducting against other garbage carting companies.

After arguing and exchanging "hostile words," Fernandez turned around to continue his work. Id. A few seconds later, Fernandez was struck from behind several times and knocked to the ground. Id. He was struck in the head at least once. Id. Fernandez claimed that during the attack, and before losing consciousness, he looked up and saw Georgison holding a black object "like a pipe." Id. (quotation marks and citation omitted). According to Georgison, two witnesses

were present when Fernandez was attacked: one of Georgison's co-workers, Thomas Oddo ("Oddo"), and a Charles Green employee, Thomas Toppin. Id.

While Fernandez was in the hospital following the attack, he was interviewed by the police. Id. During a conversation with a police detective, Fernandez described his attacker and mentioned that he had seen the attacker on an earlier date. Id. Although Fernandez suffered from some memory loss as a result of the incident, he later stated at Georgison's trial that he would never forget the face of the man who had assaulted him. Id.

On September 16, 1993, Fernandez was visited by Detective Joseph Lentini from the Organized Crime Investigation Division (the "O.C.I.D.") of the New York City Police Department and an investigator from the New York County District Attorney's Office. Id. Fernandez was shown six photographic arrays of six photographs each that were created using surveillance photos taken during a blockade at the location where the assault occurred. Id. The pictures depicted men from the shoulders up, and about nine or ten of the men had features similar to Georgison's. Id. When Fernandez came to Georgison's photograph, he identified Georgison without hesitation as the person who had assaulted him.[1] Id. However, Georgison was not arrested at that time.

On December 14, 1993, Fernandez filed an amended complaint in his civil lawsuit for assault against Mongelli Carting. Georgison, 2005 WL 1384015, at *2. The original lawsuit was filed on August 30, 1993. The amended complaint identified Georgison and Oddo as the individuals who had assaulted him on June 22, 1993. Id.

---

[1] By the time of Georgison's trial, these photographic arrays had been lost. Georgison, 2005 WL 1384015, at *1.

Approximately three years later, on February 27, 1996, Detectives Patrick McLoughlin and John Prindle of the O.C.I.D., as well as New York County Assistant District Attorney ("ADA") Jonathan Davis visited the Riverview Correctional Facility ("Riverview") to talk to Georgison about the assault on Fernandez.[2] At that time, Georgison was serving a sentence for an unrelated robbery conviction.

Sergeant Richard Peacock, a correctional sergeant at the facility, received a call from his watch commander instructing him to ask Georgison if he was willing to speak with the detectives. There were no rules or regulations in effect at the facility requiring an inmate to speak with visitors such as detectives or assistant district attorneys. Sergeant Peacock asked Georgison if he was willing to talk to the detectives. Sergeant Peacock did not threaten Georgison or make any promises to him. Georgison agreed to speak with the detectives. After the detectives and ADA Davis were escorted to the visitors' room, Georgison was brought there by Sergeant Peacock. The visitors' room contained tables, chairs, and vending machines. Georgison was not handcuffed. Id. at *2. Sergeant Peacock opened the door to the room, and Georgison entered alone while the sergeant waited outside. ADA Davis also waited outside while the detectives began their interview of Georgison. The detectives were unarmed during

---

[2] The District Court explained in its thorough Memorandum Decision that, beginning in the early 1990s, the City of New York had begun an investigation into the waste carting industry. In June of 1995, indictments were filed in New York County against several individuals, including Louis Mongelli and Paul Mongelli, the owners of Mongelli Carting. The Mongellis were charged with several serious crimes, including the assault of Fernandez. Georgison was not included in any of these charges or indictments. A New York County ADA testified in state court that the "Manhattan District Attorney's Office did not have jurisdiction to present the case against Georgison. [And t]he Bronx [County] District Attorney's Office could not have presented the case to a [g]rand [j]ury because they were unaware of the evidence [against Georgison] because it was protected from disclosure" due to the ongoing investigation at that time into the waste carting industry. Georgison, 2005 WL 1384015, at *2.

their entire time in the visitors' room.

During the interview, the detectives stated that Georgison had assaulted someone in June of 1993. Id. In response, Georgison said: "I didn't pipe no one." The detectives had not mentioned anything about a pipe being used in the assault. Id. Georgison did admit, however, that his route on the day of the assault included the premises where the assault had taken place. The detectives then asked ADA Davis to enter the room, and the ADA reiterated to Georgison that he and the detectives were there to investigate the assault. The detectives then asked Georgison if he would like to know "what would happen to the assault charge" if he cooperated with the investigation and told them "complete details of what happened." Georgison responded, "I wasn't going to be a rat, I am not going to rat on a person who gave me the best job I had, the only job." The interview ended when Georgison stated "I can't talk no more, I got to leave," at which time Georgison walked out of the room. Id. After Georgison left the room and told the sergeant that he was done, the sergeant walked him back to his housing unit in the facility. Georgison, 2005 WL 1384015, at *2.

Georgison never was given Miranda warnings prior to, during, or after the interview. Id. In addition, both the detectives and ADA Davis knew that Georgison was incarcerated for a robbery conviction, and at no point during their questioning of Georgison did they discuss that crime. Detective McLoughlin neither knew nor tried to find out whether Georgison was represented by counsel. Georgison also never asked to speak to an attorney, and he did not ask to make any phone calls. Georgison, 2005 WL 1384015, at *2.

On November 25, 1996, a New York County ADA and a police detective interviewed Fernandez and showed him six photographs. It is not clear whether these photographs were

included in the array of photographs shown to Fernandez in 1993. In any event, Fernandez again identified Georgison as the assailant. Thereafter, Fernandez identified a photograph of Georgison during the criminal trial of Louis and Paul Mongelli, the owners of Mongelli Carting. Id. On February 18, 1998, Fernandez also identified Georgison during a lineup at the Criminal Court in Bronx County, New York. Id.

B. *State Court Proceedings*

1. *The Suppression Hearing*

On April 6, 1998, Georgison was indicted in Bronx County Supreme Court of the State of New York on two counts of assault in the first degree, in violation of New York Penal Law § 120.10[4]; coercion in the first degree, in violation of New York Penal Law § 135.65; and criminal possession of a weapon in the third degree, in violation of New York Penal Law § 265.02. Id. at *3. At a combined Singer, Huntley, and Wade hearing held in the state trial court from July 21 to 23, 1999, five witnesses testified for the prosecution. Id. See generally People v. Singer, 44 N.Y.2d 241, 255 (1978) (providing a defendant with a pre-trial hearing to determine whether a pre-indictment delay was reasonable); People v. Huntley, 15 N.Y.2d 72, 78 (1965) (providing a criminal defendant with a pre-trial hearing to determine whether statements are admissible); United States v. Wade, 388 U.S. 218, 242 (1967) (providing a defendant with a pre-trial hearing to determine whether a pretrial identification of a defendant has an independent basis of reliability and is therefore admissible during trial).[3] An additional session was held on

_____

[3] With regard to Singer issues raised by Georgison, prosecutors called ADA Patrick Dugan, who testified that the fifty-six month delay in the indictment of petitioner was due to the ongoing investigation of the waste carting industry. Dugan testified that the undercover aspect of the investigation had begun in May 1992 and lasted for two and a half years. Protective orders
(continued...)

October 14, 1999, during which Fernandez testified. Georgison, 2005 WL 1384015, at *3.

In a written decision dated November 4, 1999, the state court (Bamberger, J.) denied Georgison's motion to dismiss the indictment for excessive pre-indictment delay and also denied his motions to suppress identification testimony and statements made to the police at the February 27, 1996 interview at the Riverview Correctional Facility. Georgison, 2005 WL 1384015, at *3; see also People v. Georgison, 750 N.Y.S.2d 18, 19 (App. Div. 2002). Georgison had sought to suppress the statements that he had made during the interview at Riverview; to wit, that he "didn't pipe no one"; that his carting route at the time of the assault would have brought him to the location of the assault; and that he would not be a "rat" against his employer. The state court relied on the New York Court of Appeals decision, People v. Alls, 83 N.Y.2d 94 (1993), cert. denied, 511 U.S. 1090 (1994), which held that Miranda warnings only need to be given to an inmate questioned in a correctional facility when the "circumstances of the detention and interrogation . . . entail added constraint that would lead a prison inmate reasonably to believe that there has been a restriction on that person's freedom over and above that of ordinary confinement." 83 N.Y.2d at 100.

2.    *Trial and Conviction*

---

[3](...continued)
were issued on September 28, 1995, March 15, 1996, December 13, 1996, and April 28, 1997, to protect the identity of witnesses. Dugan also testified that the orders were necessary because of the history of violence in the waste industry. Dugan explained that information regarding the assault was not turned over to the Bronx County District Attorney until shortly after June 30, 1997. Although the first protective order was not issued until September 28, 1995, Dugan stated that Georgison was not indicted prior to that date because the undercover operation was underway and disclosure of information related to the assault could have jeopardized the waste carting investigation and put undercover officers and cooperating witnesses at risk. Georgison, 2005 WL 1384015, at *3.

In May 2000, a trial was held in the Supreme Court of the State of New York, Bronx County (Silverman, J.). Georgison, 2005 WL 1384015, at *3. Georgison claimed at trial that he was unable to locate the two people whom he contended were present during the assault on Fernandez — Thomas Oddo and Thomas Toppin. Id. At trial, the state's evidence presented included a narration of the background facts detailed above. Evidence at trial also included testimony regarding Fernandez's injuries, which included a laceration on the back right side of his head, a broken second finger on his left hand, three or four linear welt marks on his right back in the shoulder area, and another linear welt on his lower anterior belly. Fernandez also suffered a contusion on his brain.

On May 23, 2000, a jury convicted Georgison of assault in the first degree, in violation of N.Y. Penal Law § 120.10[4]. On November 13, 2000, Georgison was sentenced to twelve years to life. Judgment was entered in state court, and Georgison appealed. Georgison, 2005 WL 1384015, at *3.

### 3. *Appellate Proceedings*

On direct appeal to the New York Supreme Court, Appellate Division, First Department, Georgison claimed that (1) pre-indictment delay of four years and eight months violated his statutory and constitutional speedy trial rights, (2) the admission of his statements made in prison violated his Fifth and Sixth Amendment rights against self-incrimination and to counsel, respectively, (3) the pre-trial identification procedures were unduly suggestive and out-of-court identification testimony was impermissibly bolstered, depriving him of due process, (4) the removal of Georgison's daughter from the courtroom deprived him of his right to a public trial, (5) the prosecutor made unsworn statements that prejudiced him and deprived him of a fair trial,

and (6) the prosecutor's summation unfairly prejudiced him. Georgison, 2005 WL 1384015, at *3.

In a decision dated November 12, 2002, the Appellate Division, First Department, unanimously affirmed Georgison's conviction. People v. Georgison, 750 N.Y.S.2d 18 (App. Div. 2002). With respect to the admission of Georgison's statements, the court held:

> [Georgison's] motion to suppress statements was properly denied. The statements made by [Georgison] to the police while incarcerated on an unrelated matter were voluntary and admissible. [Georgison's] incarceration did not require Miranda warnings, since the hearing evidence established that there were no restrictions on [Georgison's] freedom over and above ordinary prison confinement. [Georgison] agreed to be interviewed, and the fact that prison officials moved him to the same visiting room where inmates routinely receive visitors did not constitute the type of restraint requiring Miranda warnings.

Georgison, 750 N.Y.S.2d at 19.

On February 21, 2003, the New York State Court of Appeals denied Georgison leave to appeal the decision of the Appellate Division. People v. Georgison, 99 N.Y.2d 614 (2003).

C.    *Federal Habeas Proceedings*

In papers filed on February 20, 2004, in the United States District Court for the Southern District of New York, Georgison sought a writ of habeas corpus claiming that (1) his conviction was wrongfully obtained by the use of incriminating statements given in the absence of Miranda warnings, and (2) a delay of fifty-six months in obtaining the indictment with which he was charged, during which time he claimed two witnesses disappeared and evidence was lost, denied him due process. Georgison, 2005 WL 1384015, at *4. Specifically, with regard to the Fifth Amendment/Miranda claim, Georgison argued that, pursuant to Mathis v. United States, 391 U.S. 1 (1968), and Estelle v. Smith, 451 U.S. 454 (1981), the statements elicited from him while

he was incarcerated in state prison on another charge should not have been admitted because he was not given Miranda warnings while he was "in custody" by virtue of his incarceration.

In a decision dated June 9, 2005, the District Court denied Georgison's petition for a writ of habeas corpus. With regard to the statements that Georgison had made to officers in the visitors' room, the court determined, relying upon, inter alia, United States v. Morales, 834 F.2d 35 (2d Cir. 1987), United States v. Newton, 369 F.3d 659 (2d Cir. 2004), Leviston v. Black, 843 F.2d 302 (8th Cir. 1988), and United States v. Scully, 415 F.2d 680 (2d Cir. 1969), that Georgison was not "in custody" for purposes of Miranda because he arrived at the interview voluntarily, was not restrained during the interview, was questioned in the visitors' room at the prison, and possessed and exercised his rights to refuse to answer questions and to leave the interview when he wished. Georgison, 2005 WL 1384015, at *5. The court further held that even if the admission of the statements were erroneous, it was harmless "because there was a significant amount of evidence other than [Georgison's] statement to convict [Georgison], including four separate identifications by the victim." Id. at *6.

In its Memorandum Decision, the District Court declined to issue a certificate of appealability to Georgison because he "has not made a substantial showing of the denial of a constitutional right." Georgison, 2005 WL 1384015, at *10.

Georgison then filed a motion with this Court seeking a certificate of appealability and in forma pauperis status. By order filed February 20, 2008, this Court granted Georgison's motion "with regard to his claim that the admission at trial of his inculpatory statement, given to investigators during an interview conducted while he was incarcerated . . . on unrelated charges, was unconstitutional under Miranda v. Arizona, 384 U.S. 436 (1966)."

-11-

## II. ANALYSIS

  A. *Standard of Review Under the Antiterrorism and Effective Death Penalty Act of 1996*

  This Court reviews the district court's denial of a petition for a writ of habeas corpus de novo. Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001). Our review, however, is constrained by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254) ("AEDPA"). Under AEDPA, we may not consider claims that have not been exhausted by fair presentation to the state courts. See 28 U.S.C.2254(b)(1); Acosta v. Artuz, 575 F.3d 177, 185 (2d Cir. 2009) (citing Baldwin v. Reese, 541 U.S. 27, 29 (2004)). A federal court must consider whether a habeas petitioner adequately exhausted state remedies by fairly presenting both the factual and legal premises for his federal claim to the appropriate state courts. See 28 U.S.C. § 2254(b)(1); Baldwin v. Reese, 541 U.S. at 30–34. This requirement of exhaustion is strict and reserves only few and narrow exceptions: "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." Clark v. Perez, 510 F.3d 382, 393 (2d Cir. 2008) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)) (internal quotation marks omitted). Although the necessity to exhaust is strict, however, the standard for determining whether exhaustion has been met is relatively low. See Galdamez v. Keane, 394 F.3d 68, 72 (2d Cir. 2005) (stating that the Supreme Court has warned against interpreting whether exhaustion has been met too narrowly). In the case at bar, it is not disputed, and we agree, that all constitutional issues raised in Georgison's brief have been exhausted for purposes of 28 U.S.C. § 2254(b).

Once it is determined that a petitioner has procedurally exhausted his claims for purposes of AEDPA, "our de novo review is limited by standards of deference mandated by 28 U.S.C. § 2254(d)." Acosta, 575 F.3d at 184. Under section 2254(d), a federal court may not vacate a state conviction and grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court . . . unless the adjudication of the claim . . . resulted in a decision that was [1] contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was [2] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"We must assess the state court's decision 'in light of the record the court had before it,'" Acosta, 575 F.3d at 184 (quoting Holland v. Jackson, 542 U.S. 649, 652 (2004)). A state court's decision is then "contrary to" clearly established federal law, as expressed by the Supreme Court, if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "[C]learly established Federal law" under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003); see also Brisco v. Ercole, 565 F.3d 80, 87 (2d Cir. 2009). It "is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to that record in an objectively unreasonable manner." Id. (citing Woodford v. Viscotti, 537 U.S. 19, 25 (2002); Sorto v. Herbert, 497 F.3d 163, 166–67 (2d Cir. 2007)). An "unreasonable application" of clearly established federal law occurs "if [a] state court 'correctly identifies the

governing legal rule but applies it unreasonably to the facts of a particular prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006) (quoting Williams, 529 U.S. at 407–08). To this end, "'the increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Id. (alteration in original) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). "[C]onflating 'unreasonableness' with 'clear error' is improper because '[t]he gloss of clear error fails to give proper deference to state courts.'" Id. at 87–88 (quoting Lockyer v. Andrade, 538 U.S. 63, 75, (2003)).

B.      *The Merits of Georgison's Challenge to the Admission of His Statements at the Riverview Correctional Facility*

Georgison argues that the District Court erred in concluding that the New York state courts did not unreasonably apply federal law insofar as those courts determined that Georgison was never "in custody" for purposes of Miranda because he was not shackled or otherwise subject to unusual restraints above those of ordinary incarceration. Specifically, Georgison asserts that the state court's decision and reasoning was contrary to clearly established federal law determined by the Supreme Court of the United States, as set forth in Mathis v. United States, 391 U.S. 1 (1968). According to Georgison, Mathis stands for the proposition that persons in prison are per se "in custody" for purposes of Miranda and therefore must be advised of their rights prior to questioning by agents of law enforcement. We decline to interpret Mathis in the manner so urged for the reasons given below.

The Constitution mandates that no "person . . . shall be compelled in any criminal case to

be a witness against himself." U.S. CONST. amend. V.  This protection from compulsory self-incrimination extends to the states through the Fourteenth Amendment.  See Malloy v. Hogan, 378 U.S. 1, 6 (1964).  In Miranda v. Arizona, the Supreme Court held that the "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. 436, 467 (1966).  As a prophylactic measure to address this concern, the Court formulated the "now-familiar procedural safeguards" — the "Miranda warnings" — which were held to be necessary "to secure the privilege against self-incrimination."  Colorado v. Spring, 479 U.S. 564, 572 (1987) (internal quotation marks omitted).

It is well settled that Miranda requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, inter alia, of their right to remain silent and to have an attorney present during questioning.  The Supreme Court's concern in Miranda was the "potentiality for compulsion" inherent when a suspect is "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures."  Miranda, 384 U.S. at 457.  If a suspect is not provided with Miranda warnings, "the prosecution is barred from using statements obtained during the interrogation to establish its case in chief."  United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004) (citing Michigan v. Harvey, 494 U.S. 344, 350 (1990)).  Miranda's warning requirements, however, apply only to "custodial interrogation."  Id. at 669 (citation omitted).  Whether an individual is "in custody" — an issue we also review de novo, id.; see also Thompson v. Keohane, 516 U.S. 99, 112–15 (1995) — is determined by ascertaining whether that individual is "subjected to restraints comparable to those associated

with a formal arrest." Berkemer v. McCarty, 468 U.S. 420, 441 (1984). The ultimate question is "how a reasonable man in the suspect's position would have understood his situation." Id. at 442. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Yarborough, 541 U.S. at 663 (quoting Thompson, 516 U.S. at 112).

The critical inquiry in this case is whether Georgison was "in custody" for purposes of Miranda. In Estelle v. Smith, 451 U.S. 454 (1981), a case upon which Georgison relies, it is clear that Smith, the prisoner, was in custody within the meaning of Miranda. He was incarcerated when he made the challenged statements during a court-ordered psychiatric examination. Id. at 457. The Supreme Court held that the statements were inadmissible at the penalty phase of his trial as taken in violation of the Fifth Amendment. Id. at 461, 469. The examination having been ordered by the court, Smith was not free to terminate the psychiatric inquiry, and the custodial circumstances therefore were much different from those in the case at bar. Id. at 465.

In Mathis, the Supreme Court held that a suspect questioned while incarcerated was in custody for Miranda purposes. 391 U.S. at 5. There, an incarcerated individual was interviewed by an Internal Revenue Service ("IRS") agent about possible tax violations. The Court concluded that the trial court erred in permitting the introduction of the individual's statements at trial because no Miranda warnings were given. Id.. The Court did not further define "in custody" or provide any details as to the circumstances under which the defendant was questioned in that case. Nor did the Court hold that an incarcerated inmate is always in custody

-16-

for purposes of Miranda. Indeed, Georgison acknowledges that Mathis does not detail the particular circumstances of the defendant's interrogation in that case; e.g., whether the defendant was handcuffed, compelled to enter the interrogation room with the investigators, and how many people were present during the interview.

Following Mathis, we held in United States v. Morales, 834 F.2d 35 (2d Cir. 1987), that the custody requirement is met when the "questioning [is] conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." 834 F.3d at 38. A court should consider "whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the Miranda inquiry is at an end; the challenged interrogation did not require advice of rights." United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004) (emphasis added). In the concurring opinion in Morales, Judge Oakes opined that any interrogation of a prisoner by law enforcement for the purpose of gathering evidence is by definition a custodial interrogation:

> The principles of Miranda support a rule that prisoners are per se "in custody." Prisoners are obviously "deprived of [their] freedom of action in a [] significant way." They are aware that they cannot escape persistent custodial interrogation. Prison is "inherently coercive," and is a setting particularly susceptible to abuse. Questioning in prison involves neither brief detention nor public scrutiny, essential qualities of situations not requiring Miranda warnings. See, e.g., Berkemer v. McCarty, 468 U.S. 420, 437–38 (1984) (Miranda warnings need not precede roadside questioning of motorists detained pursuant to routine traffic stops).

834 F.2d at 40 (internal citations omitted).

Since Morales, however, the Supreme Court has cast serious doubt on the existence of a per se or bright-line rule that would require Miranda warnings in the prison setting. In Illinois v. Perkins, 496 U.S. 292 (1990), the Supreme Court upheld the admission of statements elicited,

without the benefit of Miranda warnings, from an inmate by an undercover officer masquerading as another inmate. Perkins, 496 U.S. at 295–96. The Court held that there was no danger of coercion in the "interrogation" that occurred there, and, thus, it did not offend the Court's concerns in Miranda. Id. at 298. The Court "reject[ed] the argument that Miranda warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." Id. at 297. The Court further noted that "[t]he bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that here." Id. at 299.

Subsequent to Perkins, and in his dissent from certiorari in Bradley v. Ohio, 497 U.S. 1011 (1990), Justice Marshall observed that it was an "open[] question whether 'the bare fact of custody would in every instance require a warning even when the suspect is aware that he is speaking to an official.'" 497 U.S. at 1013 (Marshall, J., dissenting from cert. denial (quoting Perkins, 496 U.S. at 299)). Justice Marshall also confirmed that the Court had yet to "clarify what constitutes 'custody' for Miranda purposes in the prison setting." Id. at 1015.

Because the per se rule urged by Georgison is not clearly established federal law, the state courts here did not unreasonably decline to apply it. See Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue in question] . . . it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" (quoting 28 U.S.C. § 2254(d)(1))). Indeed, we have held, since Mathis and Morales, that the mere fact of incarceration does not necessarily require that an individual be in the sort of custody that warrants Miranda warnings before an interview. See Newton, 369 F.3d at 670–71 (citing United States v. Willoughby, 860 F.2d 15, 23 (2d Cir.1988)); see also Rodriguez, 356 F.3d at

258 (stating that the mere fact that "Rodriguez was incarcerated at the time of the interview may not be sufficient for a finding of custodial interrogation"). For example, in United States v. Rodriguez, 356 F.3d 254 (2d Cir. 2004), where an agent of the Immigration and Naturalization Service interviewed an inmate on unrelated charges, we held that to determine whether Miranda warnings are required, a central inquiry is whether the statement at issue was made during "custodial interrogation." 356 F.3d at 258.

> Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement).

356 F.3d at 258 (internal quotation marks and citation omitted).

In addition to rejecting an interpretation of Mathis that all prisoners are "in custody" for purposes of Miranda, we conclude that the coercion inherent in custodial interrogation, which was of concern in Miranda, simply was not present here. There was no "measure of compulsion above and beyond that inherent in custody itself," Rhode Island v. Innis, 446 U.S. 291, 300 (1980), and Georgison was not "subjected to restraints comparable to those associated with a formal arrest," Berkemer, 468 U.S. at 441. There was no coercive pressure that tended to undermine Georgison's will or to compel him to speak. This is supported by the fact that Georgison felt free to refuse to answer questions and to end the interview of his own volition. It is also apparent that Georgison left the visiting room at a time and in a manner of his choosing, demonstrating that he knew he was "at liberty to terminate the interrogation and leave." See Thompson, 516 U.S. at 112. At no time was Georgison restrained during questioning, which

-19-

took place in a visitors' room and not in a cell or interrogation room which might be capable of a more profound custodial atmosphere.[4]

We conclude that <u>Miranda</u> warnings were not required in this case as "there were no restrictions on [Georgison's] freedom over and above ordinary prison confinement[,] . . . [Georgison] agreed to be interviewed," and the interview was conducted in the visiting room. <u>People v. Georgison</u>, 750 N.Y.S.2d 18, 19 (App. Div. 2002) (citing <u>People v. Alls</u>, 608 N.Y.S.2d 139 (1993)). Accordingly, the state courts' holdings that the admission in evidence of Georgison's statements was constitutional was not contrary to, or an unreasonable application of, clearly established federal law as interpreted by the Supreme Court.

**III. Conclusion**

The judgment of the District Court denying Georgison's petition for a writ of habeas corpus is affirmed, as the state courts did not unreasonably apply clearly established federal law as determined by the United States Supreme Court.

---

[4] An individual is not always "in custody" even if (s)he is not free to leave the confrontation with police, a situation not present in this case. For example, a motorist who has been stopped by the police for a traffic infraction is clearly not free to leave the confrontation, yet Miranda rights are not implicated. <u>See</u> <u>Berkemer</u>, 468 U.S. at 440. Also, despite the fact that any confrontation with police officers "will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime," even a police interrogation at the stationhouse will not give rise to a need for <u>Miranda</u> warnings if the individual is not under arrest or otherwise deprived of his liberty to leave. <u>Mathiason</u>, 429 U.S. at 495. "[T]he circumstances of each case . . . influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] <u>Miranda</u> protection." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).