**UNITED STATES of America**

v.

**John RUMBLE, Defendant.**

**No. 5:09–CR–230–DNH.**

United States District Court,
N.D. New York.

May 26, 2010.

---

The United States Attorney—Syracuse Office, Ransom P. Reynolds, III, Esq., Carla B. Freedman, Esq., of Counsel, Syracuse, NY, for the United States of America.

Law Office of George F. Hildebrandt, George F. Hildebrandt, Esq., of Counsel, Syracuse, NY, for the Defendant.

### MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

## I. INTRODUCTION

Defendant John Rumble ("defendant") is charged with one count of being an unlawful user of a controlled substance while knowingly possessing a firearm in and affecting interstate commerce in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). Defendant now moves to suppress statements he made during the execution of a warrant to search his home and to seize hair and urine samples from his person. Defendant also moves to preserve his right to determine the admissibility of anticipated expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and to compel the disclosure of requested discovery material. The United States of America ("the Government") opposes defendant's motions and cross-moves for the disclosure of evidence the defendant intends to introduce during his case-in-chief. A suppression hearing was held on February 26, 2010, in Utica, New York, to determine the admissibility of defendant's statements made both before and after he was issued warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following the hearing, decision was reserved, and the parties were permitted to submit supplemental briefings.

## II. BACKGROUND

Defendant is a federally licensed firearms dealer within the Northern District of New York. On March 31, 2009, a warrant was issued to search defendant's vehicle and residence and to seize hair and urine samples from his person. According to the warrant, there was probable cause to believe defendant had unlawfully used a controlled substance while being in possession of firearms in and affecting interstate commerce.

Law enforcement officers observed defendant's residence for several hours on April 2, 2009 until defendant was handcuffed outside his driveway at approximately 1:20 p.m. Once he was detained, United States Drug Enforcement Agency Special Agent Timothy Sinnigen and Bureau of Alcohol, Tobacco, Firearms and Explosives Agent Harold Maxwell escorted him to an area near his garage where he was questioned without being issued *Miranda* warnings.

### A. Pre–Miranda Interrogation

Agents Sinnigen's and Maxwell's accounts of the pre-*Miranda* interrogation differ slightly from that of the defendant as stated in his affidavit. Both agents testified at the suppression hearing that they asked defendant whether any traps, explosives, or other threats to law enforcement personnel were present within his residence. (Suppression Tr., 15:2–25; 71:14–25.) Defendant replied that there were several non-operational bear traps located in his home that would not pose a threat to anyone. *Id.* at 15:14–18; 72:2–4. He also indicated that they would find loaded firearms and dismantled trip wires. *Id.* at 15:19–22. Agent Sinnigen testified that he then asked defendant whether "he had a meth lab in the house," to which defendant responded, "No, I don't have a meth lab. I smoke marijuana." *Id.* at 72:5–12. Agent Maxwell testified that he asked defendant why he was wearing a ballistic vest. *Id.* at 17:7–9. According to Agent Maxwell, defendant stated that he believed there were people who wanted to kill him, including members of biker gangs

and drug dealers. *Id.* at 16:15–24. Agent Maxwell also testified that defendant said he had been tipped off that federal agents were "coming for him" and intended to plant cocaine on his person. *Id.* at 16:26–17:8.

Defendant declined to testify at the suppression hearing. Although he confirms in his affidavit that Agents Sinnigen and Maxwell asked about potential threats within his home, he also asserts that Agent Sinnigen told him there was a witness who observed him smoking marijuana. (Def.'s Aff., Dkt. No. 26–2, ¶ 4.) Defendant alleges he told Agent Sinnigen that if such a witness existed, he did not inhale the marijuana smoke. *Id.* ¶ 5. Agent Sinnigen then allegedly responded, "That's it, I got a confession," before walking away from defendant. *Id.*

### B. *Post–Miranda Interrogation*

Defendant was transported by local law enforcement officers to the Ogdensburg Police Department approximately fifteen to twenty minutes after his arrest. (Suppression Tr., 20:15–20.) Shortly after arriving at the police department, Agent Sinnigen read defendant *Miranda* warnings before asking him if he uses marijuana. *Id.* at 22:8–11; 23:24–24:3; 79:24–80:5. In response, defendant indicated he was willing to speak with the agents and that he had smoked marijuana within the last thirty days outside a local bar with a female friend. *Id.* at 24:4–7; 80:6–9. The remainder of the agents' conversation with defendant focused upon facilitating the collection of his hair and urine samples. *Id.* at 80:25–81:3. It is undisputed that defendant never invoked his right to remain silent or his right to consult with an attorney prior to answering the agents' questions.

### III.  *DISCUSSION*

#### A. *Defendant's Motion to Suppress Statements*

■ Defendant moves to suppress his statements made both before and after he was issued *Miranda* warnings. Under the Fifth Amendment to the United States Constitution, no "person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Once a suspect is taken into custody, law enforcement officials must issue *Miranda* warnings explaining the right against self-incrimination and the right to consult with an attorney prior to being interrogated. *Georgison v. Donelli,* 588 F.3d 145, 154 (2d Cir.2009) (citing *Colorado v. Spring,* 479 U.S. 564, 572, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987)). If no *Miranda* warnings are issued, statements obtained during the interrogation are typically inadmissible at trial. *Georgison,* 588 F.3d at 155 (citations omitted).

#### 1. *Pre–Miranda Statements—Public Safety Exception*

■ The Government argues that any statements defendant made prior to being issued *Miranda* warnings should be admissible under the public safety exception. Once it is established that a defendant was questioned in custody without being advised of his Fifth Amendment rights, "the burden shifts to the government to prove *Miranda* voluntariness, either because there was no custodial interrogation implicating *Miranda,* there was some exception to the *Miranda* rule, or because [the defendant] was properly Mirandized and waived his rights." *United States v. Miller,* 382 F.Supp.2d 350, 362 (N.D.N.Y.2005) (Sharpe, J.) (citing *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972); *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991)). The Supreme Court recognized that a sus-

pect's statements may be admissible despite the lack of *Miranda* warnings where the public safety exception applies. *United States v. Estrada*, 430 F.3d 606, 610 (2d Cir.2005) (citing *New York v. Quarles*, 467 U.S. 649, 655–59, 104 S.Ct. 2626, 2631–33, 81 L.Ed.2d 550 (1984)). In *Quarles*, the Court permitted the introduction at trial of pre-*Miranda* statements the defendant made concerning the whereabouts of a gun in a grocery store. 467 U.S. at 656–57, 104 S.Ct. at 2632. Due to the inherent risk of a gun hidden amongst the shelves of a crowded supermarket, the Court reasoned that a suspect's right to receive *Miranda* warnings must give way to greater social costs:

> [I]f the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

*Id.* at 657, 104 S.Ct. at 2632.

Two circumstances in *Quarles* played a central role in the Court's decision to allow the limited intrusion upon the defendant's right to receive *Miranda* warnings. First,

there was an *"immediate necessity* of ascertaining the whereabouts of a gun which [the police] had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* (emphasis added). Given the environment, the police had to act quickly because of the risk posed by other persons in the grocery store. *Id.* (explaining the risk to public safety in the event the gun was found by an accomplice, customer, or employee). Second, the arresting officer in *Quarles* "asked only the question necessary to locate the missing gun before advising [the defendant] of his rights." *Id.* at 659, 104 S.Ct. at 2633. Having neutralized the threat to public safety after locating the gun, the officer then read Quarles his *Miranda* warnings and properly assumed a more investigatory role in his interrogation. *Id.*

The Government concedes that defendant was questioned while in custody and without being issued *Miranda* warnings. (Government's Resp. Mem. of Law, Dkt. No. 44, 6.) Accordingly, the only issue governing the admissibility of defendant's pre-*Miranda* statements is whether the Government has satisfied its burden to prove that there was a sufficient risk to public safety to justify the failure to advise defendant of his Fifth Amendment rights. *See Miller*, 382 F.Supp.2d at 362 (citing *Lego*, 404 U.S. at 489, 92 S.Ct. at 626–27; *Anderson*, 929 F.2d at 98).

■ The Government argues it has met its burden to prove that the public safety exception applies because Agents Sinnigen and Maxwell testified they had specific reliable information that there were threats to law enforcement officers within defendant's home, including explosives, booby traps, and trip wires. Having reason to believe there were hazardous items inside defendant's residence, the Government contends that the agents needed to

gather information from defendant before other law enforcement officers executed the search warrant. The Government also asserts that the agents limited their pre-*Miranda* interrogation to questions necessary to ensure the safety of the officers who were about to enter defendant's residence.

Notwithstanding the belief that there were threats inside the home, the risk to public safety outside defendant's home differed from the risk at issue in *Quarles*. Foremost, there was no need for the agents to act quickly as there was in *Quarles*. To the contrary, Agent Maxwell conceded during the suppression hearing that the amount of time it may have taken to read defendant his *Miranda* warnings did not play a role in the decision to interrogate him without advising him of his rights. (Suppression Tr., 36:19–22.) Agent Maxwell also testified that, in his opinion, there would not have been any harm from reading *Miranda* warnings at that time. *Id.* at 37:13–15. Further, he stated that there was no urgency for law enforcement officers to enter defendant's home. *Id.* at 34:22–24. Agent Sinnigen also confirmed that there was no need to enter defendant's home quickly. *Id.* at 86:21–24. For example, he testified that there was no information suggesting the presence of an explosive device set to detonate in a given amount of time. *Id.* at 86:18–20. Defendant's home had been under continuous surveillance for several hours at the time he was questioned and neither agent testified that they believed there to be anyone else located in the home or on the premises. Accordingly, unlike the officers in *Quarles*, Agents Maxwell and Sinnigen were not "confronted with the immediate necessity" of neutralizing a risk to public safety. *See Quarles*, 467 U.S. at 657, 104 S.Ct. at 2632. Instead, by their own admissions, they were free to take as long as they needed to secure defendant's home and enter it safely without exposing themselves or others to additional risks.

The Government's position is also belied by its failure to introduce any evidence that Agents Sinnigen and Maxwell communicated defendant's responses to the law enforcement officers who entered his home. During the suppression hearing, Agent Maxwell eventually admitted that he never relayed the results of his pre-*Miranda* interrogation to other officers. (Suppression Tr., 49:17–22.) Although he testified that Agent Sinnigen spoke to the officers who executed the search warrant, *id.*, Agent Sinnigen never testified to that effect. Moreover, both officers testified that they left the scene almost immediately after the interrogation ended so that they could continue their interrogation of defendant at the Ogdensburg Police Department.

In light of the circumstances surrounding the pre-*Miranda* interrogation, the Government has not satisfied its burden to prove that the public safety exception applies. Based upon the testimony of Agents Sinnigen and Maxwell, there is no basis to determine that a risk to public safety justified their failure to advise defendant of his Fifth Amendment rights. Rather, the agents appeared to have conceded during the suppression hearing that they could have read *Miranda* warnings to defendant without jeopardizing the safety of the public or other law enforcement officers. Therefore, the public safety exception does not apply, and the statements made by defendant in response to questions posed prior to the issuance of *Miranda* warnings will be inadmissible during the Government's case-in-chief.

### 2. *Post–Miranda Statements— Deliberate Two–Step Strategy*

Statements made by a defendant during a custodial interrogation will be

admissible so long as the Government proves by a preponderance of the evidence that the defendant knowingly and voluntarily waived his Fifth Amendment rights. *United States v. Gaines*, 295 F.3d 293, 297 (2d Cir.2002) (citing *United States v. Male Juvenile (95–CR–1074)*, 121 F.3d 34, 39 (2d Cir.1997)). Whether a defendant knowingly and voluntarily waived his rights will depend upon the totality of the circumstances surrounding his interrogation, including the defendant's characteristics, the conditions of the interrogation, and the conduct of law enforcement personnel. *See Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir.2003) (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991)).

There is little, if any, dispute that defendant was warned of his Fifth Amendment rights before being interrogated at the Ogdensburg Police Station. Agents Sinnigen and Maxwell testified that they read defendant *Miranda* warnings, and defendant merely asserts in his affidavit that he cannot specifically recall whether Agent Sinnigen ever read him his rights. (Def.'s Aff., Dkt. No. 26–2, ¶ 10.) Consequently, there is no concrete basis to determine that any of the statements defendant made at the Ogdensburg Police Station were made prior to him receiving *Miranda* warnings.

The issue presented is therefore whether Agents Sinnigen and Maxwell used a deliberate, ask first and warn second strategy to undermine the protections afforded under *Miranda*. *See United States v. Carter*, 489 F.3d 528, 536 (2d Cir.2007). If so, the effectiveness of the *Miranda* warnings must be evaluated pursuant to the Supreme Court's holding in *Missouri v. Seibert*, 542 U.S. 600, 615, 124 S.Ct. 2601, 2612, 159 L.Ed.2d 643 (2004); *see also Carter*, 489 F.3d at 536 (comparing the circumstances of the defendant's post-warning confession to those of the defen-

dant's confession in *Seibert* in order to determine whether a deliberate, two-step strategy was employed). Otherwise, the ruling in *Oregon v. Elstad*, 470 U.S. 298, 317–18, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985) controls, and only the voluntariness of the statements need be considered. *See Seibert*, 542 U.S. at 612 n. 4, 124 S.Ct. at 2610 n. 4; *Carter*, 489 F.3d at 536.

In *Seibert*, the unwarned and warned interrogation sessions were held at the police station, were administered by the same police officer, and occurred within fifteen to twenty minutes of one another. *Seibert*, 542 U.S. at 616, 124 S.Ct. at 2612. Additionally, the scope and content of the two interviews was nearly identical, and the defendant was never told during the second interrogation that her prior unwarned statements could not be introduced against her at trial. *Id.* Under these circumstances, the Court found that *Miranda* warnings could not effectively convey to a reasonable person in the suspect's position that she maintained the ability to refuse speaking with the officers. *Id.* at 617, 124 S.Ct. at 2613.

The interrogations at issue in *Elstad* were conducted under different circumstances. In that case, the defendant was first questioned in his living room prior to being issued *Miranda* warnings. *Elstad*, 470 U.S. at 300–01, 105 S.Ct. at 1288–89. Without yet being handcuffed or informed that he was under arrest, he was asked whether he knew the victim of an alleged burglary that had been reported recently. *Id.* at 301, 105 S.Ct. at 1289. In response, the defendant admitted that he knew the victim and that he had heard the victim's home had been burglarized. *Id.* The questioning officer then told the defendant that he was believed to have been involved in the burglary, and the defendant replied, "Yes, I was there." *Id.* At that point, the

defendant was transported to the local Sheriff's headquarters. Nearly one hour later, the same officers who questioned him in his living room advised him of his Fifth Amendment rights. *Id.* He indicated that he understood his rights but nonetheless wished to speak with the officers. *Id.* Defendant then gave a complete statement confessing to his role in the burglary. *Id.* at 302, 105 S.Ct. at 1289.

The *Elstad* Court determined that the defendant's pre-*Miranda* statements made in his living room were voluntary and that "[n]either the environment nor the manner of either 'interrogation' was coercive." *Id.* at 315, 105 S.Ct. at 1296. The Court explained that "a suspect who has once responded to unwarned *yet uncoercive* questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. at 1298 (emphasis added). Having determined that the defendant's unwarned statements were made voluntarily and without coercion, the Court only considered whether the warned statements were also voluntarily made. *Id.* Based upon the "surrounding circumstances and entire course of police conduct with respect to the suspect," the defendant's post-*Miranda* statements were deemed voluntary. *Id.*

The distinctions between *Seibert* and *Elstad* were considered by the Second Circuit in *United States v. Carter*. In that case, federal agents executed a search warrant for defendant's restaurant whereupon a bag containing a large amount of illegal drugs was found on the premises. *Carter*, 489 F.3d at 531. After the search was completed, but before the defendant was Mirandized, one of the federal agents asked him if brown powder found in the bag was heroin, to which he replied, "No, it's bad." *Id.* at 532. The same agent then asked, "Bad what?" and the defen-

dant responded, "Bad coke." *Id.* Slightly more than an hour later, the defendant was Mirandized and asked questions by a different federal agent during a ten minute custodial interrogation at a nearby field office for federal law enforcement. *Id.* at 533. During the second interview, the defendant waived his Fifth Amendment rights and admitted that he had possessed the drugs recovered during the search of his restaurant. *Id.* The Second Circuit determined that the federal agents did not employ a deliberate, ask first and warn second strategy in light of several key differences between the interrogation of the defendant and that of the defendant in *Seibert. Id.* at 536–37. First, the *Carter* court explained that there was little if any overlap between the defendant's pre- and post-*Miranda* statements. *Id.* at 536. The defendant's unwarned statements were limited to his response that the brown substance was "bad coke," whereas his warned statements discussed at length his prior drug dealings and his possession of the bag found in his restaurant. *Id.* Second, the questioning occurred at two different locations and there was more than an hour in between the defendant's two sets of statements. *Id.* Last, and perhaps most importantly, the pre- and post-*Miranda* interrogations were conducted by two different federal agents. *Id.* The *Carter* court emphasized that "the post-warning questioning was not a continuation of the prewarning question" because the agent who conducted the second round of questioning did not learn about the prior inculpatory statement until well after his interrogation had concluded. *Id.* Based upon these findings, the Second Circuit found that *Elstad*, as opposed to *Seibert*, governed the admissibility of the defendant's post-*Miranda* statements. *Id.* The court found analogous the circumstances surrounding the defendant's interrogation to those considered in *Elstad*, and

accordingly, determined that both of the defendant's statements were made voluntarily and without improper coercion. *Id.* at 537.

■ But for the fact that the two interrogations occurred at different locations, much of the present case under consideration parallels the circumstances at issue in *Seibert.* In both cases, the defendants were Mirandized and questioned approximately fifteen to twenty minutes after making unwarned inculpatory statements during custodial interrogations. Both cases also involved pre- and post-*Miranda* interrogations that were conducted by the same officers, whereas the holding in *Carter* depended, at least in part, upon the use of a new officer to Mirandize the defendant and ask questions without the benefit of knowing the prior inculpatory statement. Finally, it is apparent that "the second round of interrogation was essentially a cross-examination using information gained during the first round of interrogation. . . ." *Carter,* 489 F.3d at 536 (describing the interrogation in *Seibert* ). Defendant's pre-*Miranda* interrogation covered much more subject matter than did the brief conversation at the Ogdensburg Police Station. Moments after defendant was tackled, handcuffed, and carried to the side of his home near his garage, Agents Sinnigen and Maxwell asked him multiple questions about his home, any weapons he was in possession of, whether he had a methamphetamine lab, why he was wearing a ballistic vest, and why he thought his life was in danger. Only fifteen to twenty minutes later did the agents Mirandize him and parse out his unwarned, prior inculpatory response. The agents' admission that there was no urgent need to question defendant without advising him of his rights reflects the deliberateness of their strategy to obtain information before issuing *Miranda* warnings. Further, their decision to limit their post-*Miranda* interrogation to the singular question of whether defendant uses marijuana also highlights the use of an ask first, warn second tactic. Having already obtained all of the information they needed during the first round of questioning, Agents Sinnigen and Maxwell simply Mirandized defendant and asked him to confirm that he smoked marijuana.

As in *Seibert,* these circumstances suggest that the agents deliberately sought inculpatory responses from defendant with the intention of eventually Mirandizing him so as to preserve the admissibility of his statements. Unlike the prior relevant cases, the unwarned questioning of defendant outside his home was not the result of a federal agent's curiosity about a brown substance, *see Carter,* 489 F.3d at 537, or a police officer's desire to notify a suspect of the reason for his arrest. *See Elstad,* 470 U.S. at 315, 105 S.Ct. at 1296. Rather, defendant could have been issued *Miranda* warnings without compromising anyone's safety, but the agents nonetheless proceeded to ask him questions which could be expected to elicit an inculpatory response. They then effectively continued the conversation by briefly asking him to confirm one of his responses after Mirandizing him only fifteen to twenty minutes later. Accordingly, there was a deliberate, two-step strategy to undermine the protections afforded under *Miranda,* and defendant's motion to suppress his warned statement that he used marijuana will be granted.

## B. *Defendant's Motion to Preserve the Right to a Daubert Hearing*

With no objection from the Government (*see* Government's Resp. Mem. of Law, Dkt. No. 44, 14), defendant's motion to preserve his right to a *Daubert* hearing to

challenge the admissibility of expected expert testimony will be granted.

### C. *Defendant's Motion to Compel Disclosure of Discovery Material*

Based upon the Government's continuous compliance with its obligation to provide defendant with available exculpatory material, including evidence concerning the credibility of the Government's witnesses at trial, defendant's motion to compel disclosure of such material will be denied without prejudice.

### D. *Government's Cross–Motion for Disclosure of Discovery Material*

Based upon defense counsel's representation that it is not in possession of the requested material at this time, the Government's cross-motion to compel disclosure of such material will be denied without prejudice.

## IV. *CONCLUSION*

Suppression of defendant's unwarned statements is warranted in light of the Government's failure to prove by a preponderance of the evidence that the public safety exception applies. Two factors were critical to the determination that the Government failed to satisfy its burden. First, Agents Sinnigen and Maxwell conceded that there was no need to interrogate defendant without advising him of his Fifth Amendment rights. As a result, the circumstances surrounding his pre-*Miranda* interrogation differ significantly from the scenario considered by the Supreme Court in *Quarles*. Second, the Government did not introduce any direct, credible evidence at the suppression hearing that would tend to show that defendant's responses while questioned outside his home near his garage were eventually communicated to the officers who executed the search warrant. This evidentiary deficiency directly cuts against Agents Sinnigen's and Maxwell's claim that they questioned defendant out of concern for officers' safety. Therefore, defendant's statements made prior to being issued *Miranda* warnings will be inadmissible at trial.

Suppression of defendant's post-*Miranda* admission that he used marijuana is also warranted in light of the circumstances surrounding the interrogation conducted by Agents Sinnigen and Maxwell. Given the short amount of time between defendant's two admissions that he used marijuana, there is serious doubt cast upon the efficacy of the *Miranda* warnings that were issued. Further, the breadth of the pre-*Miranda* interrogation as compared to the limited focus of the post-*Miranda* interrogation illustrates the agents' attempt to conduct their investigation without advising defendant of his Fifth Amendment rights only to then shortly thereafter salvage the admissibility of his prior inculpatory statement by briefly asking him to repeat his admission of guilt after he was Mirandized. Therefore, defendant's admission that he used marijuana made after he was issued *Miranda* warnings will also be inadmissible at trial.

With respect to any challenges to expected expert testimony pursuant to *Daubert*, defendant may file the necessary motion for a hearing in the event such a challenge is made. The remainder of the parties' motions are premature at this time, and may be renewed as defendant's trial date approaches.

Accordingly, it is

ORDERED that

(1) Defendant's motion to suppress statements made before he was issued *Miranda* warnings is GRANTED;

398

(2) Defendant's motion to suppress his statement made after he was issued *Miranda* warnings is GRANTED;

(3) Defendant's motion to preserve his right to a *Daubert* hearing is GRANTED;

(4) Defendant's motion to compel the disclosure of discovery material is DENIED without prejudice; and

(5) The Government's cross-motion to compel the disclosure of discovery material is DENIED without prejudice.

IT IS SO ORDERED.